IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:23 C 50159 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| MARTIN O'MALLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(I), 423, almost four years ago in December of 2019 (Administrative Record (R.) 195-200) and in January of 2020 (R. 205-11). She claimed he had been disabled since March 1, 2019. (R. 223, 233) as a result of "Morton's neuroma, Peripheral neuropathy/ peripheral neuritis, Carpal tunnel syndrome, Clinical depression, Generalized anxiety disorder." (R. 222, 237). Over the next three years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on May 5, 2023, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on September 21, 2023. [Dkt. #13]. The case was fully briefed as of October 6, 2023 [Dkt. ##8, 12, 15] and was reassigned to me almost a year later on September 10, 2024. [Dkt. #20]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: cervical spondylosis, Morton's neuroma, peripheral neuropathy, bilateral carpal tunnel syndrome, depressive disorder, unspecified, and anxiety disorder." (R. 18). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 1.15, 11.14, 12.04, and 12.06. (R. 18). With regard to the plaintiff's mental impairments, the ALJ found that the plaintiff had no limitation in understanding, remembering or applying information; a mild limitation in interacting with others; and moderate limitations in concentrating, persisting or maintaining pace and in adapting or managing oneself. (R. 18-19).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to perform medium work:

> except that the [plaintiff] may frequently reach overhead, handle and finger; the [plaintiff] may occasionally balance, stoop, climb ramps and stairs, but may never kneel, crouch, crawl, climb ladders, ropes, or scaffolds; the [plaintiff] must avoid all exposure to unprotected heights and hazardous machinery; the [plaintiff] is limited to the performance of simple, routine tasks and to the making of no more than simple, work-related decisions, conducted in a work setting that is routine, in that it contemplates few changes.

(R. 20). The ALJ then summarized the plaintiff's allegations, noting that the plaintiff said she had frequent falls, neck pain, and difficulty grasping, lifting, squatting, bending, standing, reaching, walking, kneeling, climbing, and using her hands. She also said she had problems concentrating and completing tasks. (R. 20). The ALJ then went on to summarize the medical evidence, which was scant. A radiographic study of the cervical spine on January 26, 2022, revealed mild spondylosis. (R. 20). While plaintiff was taking a prescription muscle relaxant in 2019, by early 2020 she had stopped using any medication. She had chiropractic therapy between January 20, 2021, and February 17, 2021 and showed improvement after three visits, but did not return. (R. 21).

The ALJ went on to note that, generally, clinical examinations revealed mild or benign findings. Examination on August 7, 2019, noted mild, parascapular spasms, but no cervical tenderness, and normal strength, sensory function and reflexes. On October 25, 2020, plaintiff exhibited a normal cervical range of motion, normal range of motion in all extremities, normal strength, sensory function, reflexes, coordination, manipulation and grip strength. Phalen's and Tinel's signs were negative and gait was normal. On January 26, 2022, cervical range of motion was normal, as was range of motion in all extremities, and strength, sensory function, reflexes, gait, coordination, manipulation, and grip were all also normal. (R. 21).

The ALJ went on to note that plaintiff had carpal tunnel release surgery in 2014, and that she has reported relief of symptoms as a result. She also reported relief of symptoms in her left-hand wrist with the use of a brace and in her foot (Morton's neuroma) with orthotic inserts. She has not engaged in physical therapy or pain management. (R. 21). In sum, the ALJ explained that the overall benign findings indicated that plaintiff's physical impairments were not as severe as alleged and would not preclude the performance of medium work, aside from a number of postural restrictions. (R. 22).

As for the plaintiff's mental impairments, the ALJ noted that the plaintiff was diagnosed with depressive disorder, unspecified and anxiety disorder on July 25, 2020. She then followed an ever-decreasing regimen of psychotropic medications, finally denying use of any such medication by January 2022 due to what she said were side effects of nausea and oversleeping. Plaintiff had not followed any course of formal behavioral health treatment for a number of years. At her consultative mental status examination on July 25, 2020, the plaintiff presented with an anxious, angry mood, but also as open, with normal speech, appropriate eye contact, and cooperative behavior. She was able to follow instructions, denied delusions, hallucinations, suicidal ideation. She exhibited an appropriate affect, normal recall, no deficits of insight or judgment, able to reason in abstract fashion, to recall six digits forward and five in reverse. (R. 22).

The ALJ noted that the plaintiff's daily activities were essentially unrestricted: childcare, pet care,

household chores, cleaning, cooking, laundering clothing, using a riding lawn mower, driving a car, shopping in stores, reading and watching television, managing finances, appointments and medications, and working part-time. (R. 22-23). He added that the plaintiff had made a few statements about her course of treatment that were unsupported by the medical record. (R. 23). The ALJ then found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. (R. 23).

The ALJ then considered the medical opinions. The two state agency doctors who reviewed the medical evidence found that the plaintiff had no severe physical impairment. The ALJ disagreed with those assessments, finding that the plaintiff did have severe impairments that lead to some postural and manipulative restrictions, albeit mild ones. (R. 23-24). One state agency psychologist who reviewed the record said plaintiff could perform one-to-two-step tasks, while the other said the plaintiff could perform both simple and detailed tasks. The ALJ felt the opinions were only marginally consistent with, and supported by, the overall evidence of record and were not persuasive. He explained that if plaintiff were "limited to the performance of simple, routine tasks, conducted free of the need to mull complex decisions, performed in a setting where she would not be asked to respond to constant change, she appears to have retained sufficient, residual, adaptive capacity to engage in competitive work." (R. 24). The ALJ added that none of the plaintiff's treating or examining physicians provided any opinions regarding her disability. (R.24).

The ALJ then relied on the testimony of the vocational expert to find that there were jobs that the plaintiff could perform that existed in significant numbers in the national economy. Examples were: machine feeder (DOT#699.686-010; 17,000 jobs), and laundry worker (DOT #361.685-018; 55,000 jobs). Accordingly, the ALJ found the plaintiff not disabled and not entitled to benefits under the Act.

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion.'' *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review

of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax", *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on that panel felt the ALJ had not

6

adequately explained aspects of her reasoning while a third judge, dissenting, thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit has again emphasized that all ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The court has explained "that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024); *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024)(". . . ALJs are 'subject to only the most minimal of articulation requirements"—an obligation that extends no further than grounding a decision in substantial evidence."). So, as ever, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).

### III.

The plaintiff has a handful of problems with the ALJ's decision. First, she complains that the ALJ did not explain how he concluded that the medium RFC adequately accounted for her cervical degenerative spondylosis, Morton's neuroma, and obesity. Second, the plaintiff contends that the ALJ failed to address why the RFC was devoid of restrictions to accommodate her moderate limitation in concentrating, persisting, or maintaining pace and devoid of a determination of whether plaintiff could meet off task and absenteeism benchmarks given her mental limitations. Third, the plaintiff argues that the ALJ did not explain why the RFC lacks social interaction restrictions despite assessing a limitation in interacting with others. And, finally, the plaintiff complains that the ALJ did not explain the bases for the restriction to frequent reaching given her cervical spondylosis. Any other arguments the plaintiff might have presented are deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020).

The plaintiff's criticisms of the ALJ's decision have to be viewed through two lenses. The first has already been mentioned: ". . . ALJs are 'subject to only the most minimal of articulation requirements'—an obligation that extends no further than grounding a decision in substantial evidence." *Morales*, 103 F.4th at 471; *Warnell*, 97 F.4th at 1053. The second is the fact that the plaintiff bears the burden to prove she is disabled by producing medical evidence. 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability...."); 20 C.F.R. §§ 404.1529(a); 416.929(a); *Gedatus*, 994 F.3d at 905 (7th Cir. 2021); *Karr*, 989 F.3d at 513 (7th Cir. 2021)(plaintiff must "identify[ ] ... objective evidence in the record" that she is disabled); *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). The medical record in this case is, as the ALJ indicated, scant. And the plaintiff's brief is, in the main, supported by citations to her allegations – which, of course, are *not* medical evidence, *see, e.g., Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)(a plaintiff's allegations "are the opposite of objective medical evidence . . . .") – or citations to

8

diagnoses – which, while medical evidence, do nothing to establish disability. *Schmidt*, 395 F.3d at 746 (explaining that the fact that a plaintiff has a certain impairment does not mean, on its own, that plaintiff suffers certain symptoms); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998)("It is not enough to show that she had received a diagnosis . . . since [the impairment] is not always (indeed, not usually) disabling.");*Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("The issue in the case is not the existence of these various conditions of hers but their severity....").

### A.

While the plaintiff claims she became disabled in March of 2019, she saw a physician twice in the period between that date and 2021. She had a physical exam for work on August 7, 2019. (R. 395). The plaintiff said she had no medical problems or concerns, aside from "chronic, intermittent limb weakness after strenuous activity." (R. 404). There were some lab tests done, which were all normal with the exception of a couple of liver enzymes which were elevated, perhaps due to "long term current use of therapeutic drug" (R. 400), and cholesterol. (R. 401). Physical examination was normal with exception of mild muscle spasm in the scapular region. (R. 405). The exam was "satisfactory" for employment. (R. 406).

On October 25, 2019, plaintiff saw her physician for "routine follow-up of her peripheral neuropathy" and smoker's cough. (R. 385). She complained of bouts of weakness and instability in her legs at home and at work. (R. 385). Exam showed normal 2+ reflexes throughout. Breath sounds were decreased. There was an unspecified sensory deficit and coordination was said to be "abnormal." (R. 386). There was no cranial nerve deficit; muscle tone was normal. (R. 386). Lab tests were normal. (R. 381). She was noted to be depressed and withdrawn. (R. 386). Cognition and memory were normal. (R. 386). A brain MRI was recommended for balance problems, but plaintiff never followed up. (R. 387). She was told to at least cut down to a half pack of cigarettes a day. (R. 387). She got a flu vaccine. (R. 387).

The next time the plaintiff saw a doctor was July 25, 2020, because she had to have consultative

9

exams having had applied for benefits in December 2019 and January 2020. (R. 195, 205). At her psychological consultation, in July 2020, exam results – insight and judgment, recent and remote memory, attention and concentration, and fund of knowledge – were normal (R. 343). Similarly, plaintiff's physical consultative examination on October 25, 2020, gave no indication she was disabled. Tinel's sign was negative for nerve damage, and Phalen's sign was negative for carpal tunnel syndrome. Gait was normal. Heel/toe walk was normal. Manipulation and grip strength wee normal. Range of motion was normal in the shoulders, elbows, wrists, hips, knees, ankles. Range of motion in the cervical spine was full although plaintiff complained of pain during manipulation. Range of motion in the lumbar spine was full. Straight leg raising was negative. Neurological exam was normal. (R. 348). Strength and sensory exams were both normal. (R. 350)

The next piece of medical evidence in the record are notes from three chiropractic sessions in early 2021. That was well over a year since the last time plaintiff sought treatment for any medical problems. Complaining of neck and shoulder pain, she went to a chiropractor three times for manipulation; on January 20, 2021 (R. 366-67), and February 5, 2021 (R. 368-69), and February 17, 2021 (R. 370-71). She said she had never sought any treatment before. (R. 366). No clinical notes from the sessions indicate any limitation of function, other than the observation that muscles along the spine were stiff. (R. 365-66).

Another year went by before plaintiff saw a doctor. She had another consultative physical exam on January 26, 2022. Examination was much the same as the one in 2020, with normal results throughout, although there was no pain reported with cervical spine range of motion. (R. 356). A cervical spine x-ray revealed mild degenerative spondylosis. (R. 363).

That's it. Over the course of about three and a half years, the plaintiff saw a physician twice, for an employment physical and for routine follow-up regarding her neuropathy.[1] Neither time did the doctor

---

[1] An obvious flaw in the plaintiff's case for benefits is the paucity of medical evidence and treatment. The plaintiff argues that the ALJ was not entitled to draw any conclusions from that, at least

(continued...)

suggest anything prevented her from working – actually, no doctor has - and that speaks volumes. *See, e.g., Moyer v. O'Malley*, No. 23-2599, 2024 WL 1411565, at *3 (7th Cir. Apr. 2, 2024)("An ALJ does not err in assigning a residual functional capacity if there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ."); *Tutwiler*, 87 F.4th at 860 ("Also, [plaintiff] did not provide any opinion from a doctor who would have imposed greater restrictions than those the ALJ found in his decision.... The lack of an opposing medical opinion makes it difficult for us to find that the ALJ misjudged the evidence so significantly as to warrant reversal."); *Gedatus*, 994 F.3d at 904 ("A fundamental problem is [the plaintiff] offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set.").

She did seek treatment for pain from a chiropractor in January and February of 2021, but never again. Her three consultative exams during this period were all normal. As the plaintiff tacitly concedes in her brief [Dkt. #8, at 2-3, 14], the only physical clinical findings were mild muscle spasms in the shoulder in August 2019, pain during cervical spine range of motion exam in rotation in October 2020, and mild cervical spondylosis in January 2022. Psychologically, plaintiff was noted on a single occasion in three and a half years to be withdrawn and depressed. Her consultative psychological exam was normal. These are simply not the type of findings one associates with an inability to perform work.

When one simply looks at the medical evidence and reads the ALJ's decision discussing that

---

[1](continued...) not without exploring the plaintiff's reasons for rarely seeing a doctor, while at the same time claiming to be disabled. Such arguments are all too common and, as seems always to be the case, the plaintiff here has not so much as suggested a reason for not having pursued a level of medical treatment concomitant with her claims of disability. While it is the case that an ALJ should inquire into the reasons for lack of medical treatment, *see, e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), if the plaintiff is unable to posit a valid reason for the lack of much in the way of a medical record in her brief in federal district court, she's just inviting speculation, and that's not enough to overturn an ALJ's decision. *Arnold v. Saul*, 990 F.3d 1046, 1048 (7th Cir. 2021); *McHenry v. Berryhill*, 911 F.3d 866, 874 (7th Cir. 2018). After all, if the plaintiff can't say why she eschewed more medical treatment in 30 pages of briefing over the course of two and a half months [Dkt. ##8, 15], who can? As such, this has to be regarded as an undeveloped argument and undeveloped arguments are deemed waived. *Krell v. Saul*, 931 F.3d 582, 587 n.1 (7th Cir. 2019); *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018); *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

evidence and noting that, overall, medical findings were in the main mild, benign, or normal, it would be difficult, if not impossible, to say that his determination that plaintiff was not disabled should be affirmed. Perhaps there is a note or two that might arguably detract from a finding of "not disabled", but that's not nearly sufficient to overturn an ALJ's decision under the "substantial evidence" standard. "[T]he presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence." *Gedatus*, 994 F.3d at 903. Here, it has to be said that the ALJ's decision is supported by *at least* a preponderance of the evidence, and that's well beyond what's necessary to affirm it. *Schmidt*, 496 F.3d at 842; *Skinner*, 478 F.3d at 841; *see also Streikus v. O'Malley*, No. 22-2484, 2024 WL 983568, at *3 (7th Cir. Mar. 7, 2024); *Outlaw v. Astrue*, 412 F. App'x 894, 897 (7th Cir. 2011).

**B.**

But, as was said earlier, the Seventh Circuit has that "logical bridge" requirement. And the plaintiff, perhaps due to the dearth of medical evidence, focused on that "requirement" in her brief. So, the reviewing court, despite the record pointing clearly in the direction of affirmance, has to explain how the ALJ's decision adequately explains how he got from the evidence to his result. The Seventh Circuit has recently allowed that magistrate judges need not jump through hoops to adequately accomplish that task. *See Morales*, 103 F.4th at 471 ("ALJs are 'subject to only the most minimal of articulation requirements' . . . . The same holds true for district courts who themselves see meaningful numbers of appeals from adverse administrative disability determinations. A district (or magistrate) judge need only supply the parties (and us, if a further appeal is pursued) with enough information to follow the material reasoning underpinning a decision."). As much as the foregoing discussion of the record and the ALJ's decision is adequate, we will briefly address the plaintiff's "logical bridge" criticisms.

**1.**

The plaintiff complains that the ALJ didn't *explain* how the evidence showed that she could stand or walk for six hours a day. [Dkt. #8, at 8]. But the ALJ summarized the record thoroughly, and

12

appropriately. *See Grotts*, 27 F.4th at 1278; "An ALJ need not discuss every detail in the record as it relates to every factor.... Summaries of medical evidence, while definitionally 'partial and selective,' are appropriate."); *Gedatus*, 994 F.3d at 901 (7th Cir. 2021)(". . . if [plaintiff] is complaining that the ALJ summarized the medical evidence, that is unavailing because summaries are appropriate."). As the previous discussion made clear, there wasn't much evidence at all, so it was hard *not* to be thorough. Plaintiff claims that there is "objective evidence" that she cannot stand or walk enough to perform medium or even light work. [Dkt. #8, at 8]. But, again, the record says otherwise. Muscle stiffness in her back January or 2020, mild spasm in her shoulder at one of two exams in 2019, and mild spondylosis on a cervical spine x-ray in 2022 do not begin to prove she could not stand or walk for most of a workday.

She says she testified she had to rest for seven hours after standing or walking and fell down a few times a month. [Dkt. #8, at 8]. But, those are allegations. Again, they "are the opposite of objective medical evidence . . . ." *Schaaf* , 602 F.3d at 875. There is no record of any treatment for Morton's neuroma. There is no record of any treatment for falling down. There is not even any indication that the plaintiff ever told a doctor on either of the two days she saw one in 2019 that she had to stay off her feet for most of the day or that she fell down a few times a month. She didn't say anything about it to her chiropractor either. In fact, the plaintiff's own description of her Morton's neuroma symptoms at her consultative exam belies her arguments that it is somehow disabling: "To relieve pain she wears inserts. She cannot walk bare foot [sic] or with no inserts. Then she gets pain. To relieve pain, she gets off her feet or wears inserts." (R. 346).

2.

Plaintiff next takes the ALJ to task for the way he assessed her moderate limitation in concentration, persistence, or pace ("CPP"). First, it seems that the plaintiff contends that the ALJ should have found that she had more than a moderate limitation. But, again, she fails to direct the court to any medical evidence that shows she is more limited that the ALJ found she was. *See, e.g. Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022)(noting that the claimant bore the burden of establishing that

her impairments required limitations beyond those set forth by the ALJ); *Gedatus*, 994 F.3d at 905 ("Besides, [plaintiff] has not pointed to any medical opinion or evidence to show . . . any specific limitations."); *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017)(plaintiff "offered no evidence that ... necessitated additional functional restrictions beyond those already incorporated in the RFC."). Instead, the plaintiff says she testified that she had difficulty concentrating when she was in pain or suffering a migraine and suffered migraines every week. (R. 49). But the ALJ properly found there was no medical evidence to establish the existence of migraines as a medically determinable impairment. And, the plaintiff fails to direct the court to any in her brief.

Moreover, at the administrative hearing, when the plaintiff said she had trouble focusing (R. 51), it was in response to questions "about mental health . . . depression, anxiety" (R. 50). As the ALJ pointed out, there was little or no medical evidence regarding plaintiff's depression and no evidence of regular treatment or therapy. And, as the ALJ noted, the only assessments in the record of plaintiff's concentration indicated that her attention and concentration were within normal limits (R. 343) and that her "[c]ognition and memory [we]re normal . . . She is attentive." (R. 386). Even in the plaintiff's written statements – which the plaintiff for some reason cites to as evidence of more than moderate CPP limitations – she reported that she reads, does puzzles, and plays board games daily (R. 262, 296), and that she follows both written and spoken instructions very well. (R. 263, 297). Those things may not rule out limitations in CPP, but they certainly don't prove the plaintiff's limitations are more than moderate.

### 3.

The plaintiff also argues that an RFC limiting her to "the performance of simple, routine tasks and to the making of no more than simple, work-related decisions, conducted in a work setting that is routine, in that it contemplates few changes" does not accommodate a moderate limitation in CPP. [Dkt. #8, at 10-11]. But, the ALJ provided an adequate analysis – at the very least –of how he accommodated any limitations stemming from the plaintiff's psychological impairment, explaining that they:

14

> would be expected to, and the [plaintiff] reports does report, impose at least episodic deficits of focus and concentration. However, the [plaintiff] retains a good fund of knowledge, with memory, attention and concentration generally reported as within normal limits. Provided she is restricted to the performance of simple, routine tasks, conducted free of the need to mull complex decisions, she appears to have retained sufficient, residual, cognitive function to serve as "backstop" against these deficits from becoming fatal to competitive work. The [plaintiff]'s disorders would also be expected to impose lowered tolerance for frustration or stressors, particularly as she has been going without treatment since early 2022. However, the [plaintiff] exhibits normal insight and judgment (2F/3) and was able to add a second part-time job, without discernible difficulties. Provided she is limited to the performance of simple, routine tasks, conducted free of the need to mull complex decisions, performed in a setting where she would not be asked to respond to constant change, she appears to have retained sufficient, residual, adaptive capacity to engage in competitive work.

(R. 24). It's unclear what more would be necessary. Indeed, it's along the lines of what the Seventh Circuit found adequate in *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020), the principal case the plaintiff cited in support of her argument that the ALJ didn't do enough. And, it has to be remembered that there is no categorical rule that an ALJ may never accommodate "moderate" limitations in concentration, persistence, and pace with only a restriction to simple tasks. *Weber v. Kijakazi*, No. 20-2990, 2021 WL 3671235, at *5 (7th Cir. Aug. 19, 2021); *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021). In these situations, considering "logical bridge" arguments such as those the plaintiff has lodged, it might be helpful if a plaintiff's brief perhaps gave an example of what would suffice, in their mind, as an adequate explanation for how a particular restriction accommodates a particular limitation. At the very least, it would satisfy the court's curiosity as to just what an adequate "logical bridge" might look like from plaintiff's perspective. But we never see such things and, as noted early on, an explanation that's adequate for one reviewer may leave another unsatisfied.

In this context it's important to remember another point. A "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. As the Seventh Circuit has allowed:

> "fair" in ordinary usage does not mean "bad" or "inadequate." So a "moderate" limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace. Further, that assessment is consistent with both [state agency reviewers'] findings that [plaintiff] could carry out simple instructions and make simple decisions with no significant limitation.

15

*Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021). The same goes here. The state agency reviewing doctors all found that, despite a moderate limitation in CPP, plaintiff could perform simple tasks and follow, at least, simple instructions. (R. 73-74, 83, 93).

The plaintiff also wanted a specific job restriction accommodating the ALJ's finding that she had a *mild* limitation in interacting with others. She doesn't provide any clues as to what that accommodation might be, which is fatal to her argument. *See Gedatus*, 994 F.3d at 905; *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("[E]ven if the ALJ's RFC assessment were flawed, any error was harmless" because "[i]t is unclear what kinds of work restrictions might address [claimant's] limitations ... because he hypothesizes none" and "the medical record does not support any."). And, in any event, a mild limitation in interacting with others means her "functioning in this area independently, appropriately, effectively, and on a sustained basis is [only] slightly limited." 20 C.F.R. pt. 404, Subpt. P, App. 1, §12.00F(2)(b). So, again, the question is what RFC limitation does the plaintiff suggest would account for a slight limitation in interacting with others especially in the course of working as a machine, feeder, laundry worker, or laundry attendant? It's a question the plaintiff's brief leaves unanswered.

### 4.

Finally, the plaintiff argues that the ALJ did not adequately explain how the medical evidence provided a basis for the ALJ's finding that the plaintiff could perform frequent overhead reaching. But, the ALJ clearly pointed to clinical findings from exams in August 2019, October 2020, and January 2022. (R. 21-22). As already detailed previously, the clinical findings throughout were, with isolated exceptions, mild or normal. The only x-ray in the record deemed plaintiff's cervical spondylosis to be mild. There was one occasion where plaintiff exhibited parascapular muscle spasm and it, too, was deemed to be mild. Examinations of upper extremities revealed normal strength, grip, range of motion, etc. No doctor expressed any restriction on the plaintiff's ability to reach overhead. *See Moyer*, 2024 WL 1411565, at *3; *Tutwiler*, 87 F.4th at 860; *Gedatus*, 994 F.3d at 904, 905. There was a single instance in the record where cervical range of motion – which was full – elicited pain which, obviously, cannot outweigh the substantial evidence – really,

16

the preponderance of evidence – supporting the ALJ's finding. *Gedatus*, 994 F.3d at 903. All of these types of findings tend to undermine the plaintiff's allegations about the extent of her limitations. All this, begs the question, not how could the plaintiff be able to reach frequently, but how could the plaintiff *not* be able to reach frequently.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. #8] is denied, the defendant's motion for summary judgment [Dkt. #12] is granted, and the ALJ's decision is affirmed.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/18/24